CLERKS OFFICE U.S. DIST COURT
AT DANVILLE, VA
FILED

MAR 22 2018

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| WALTER DELANEY BOOKER, ) | Civil Action No. 7:16-cv-00084 | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | MEMORANDUM OPINION | |
| ) | | |
| M.E. ENGELKE, et al., ) | By: Hon. Jackson L. Kiser | |
| Defendants. ) | Senior United States District Judge | |

Walter Delaney Booker, a Virginia inmate proceeding pro se, filed a verified second amended complaint (ECF No. 42-1) pursuant to 42 U.S.C. §§ 1983 and 2000cc-1, et seq.[1] Plaintiff names numerous staff of the Virginia Department of Corrections ("VDOC"), Wallens Ridge State Prison ("WRSP"), and Greensville Correctional Center ("GRCC") as defendants.[2] Plaintiff argues that defendants substantially burdened his religious exercise, imposed cruel and unusual punishment, and violated due process, in violation of the First, Eighth, and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Defendants filed a motion for summary judgment, arguing, inter alia, the defense of qualified immunity, and Plaintiff responded, making this matter ripe for disposition.[3] After reviewing the record, I grant in part and deny in part Defendants' motion for summary judgment, direct them to

---

[1] The pleading consists of 253 paragraphs, not including sub-paragraphs. Plaintiff also filed a "second declaration" (ECF No. 4) and "third declaration" (ECF No. 11) in support of the pleading although no first declaration was filed separately. Exhibits A-D (ECF No. 1-1) were included with the original complaint, and exhibits F-I (ECF Nos. 42-2 – 42-4) were included with the second amended complaint. There does not appear to be an Exhibit E.

[2] One named defendant is "Unknown Chow Hall Officers." A group of persons, like "Unknown Chow Hall Officers," is not a "person" subject to 42 U.S.C. § 1983. See, e.g., Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); Ferguson v. Morgan, No. 1:90cv06318, 1991 U.S. Dist. LEXIS 8295, 1991 WL 115759, at *1 (S.D.N.Y. June 20, 1991) (concluding that a group of personnel, like "medical staff," is not a "person" for purposes of § 1983). Accordingly, any § 1983 claim against defendant "Unknown Chow Hall Officers" is dismissed without prejudice.

[3] The forty-six page response (ECF No. 60) was captioned as the "fourth declaration." Two months after the response, Plaintiff filed a motion for discovery, to which Defendants objected (ECF No. 65) and Plaintiff responded. Plaintiff had not certified that he attempted to confer with Defendants to resolve discovery before filing the motion for discovery. Fed. R. Civ. P. 37(a)(1). Accordingly, the motion is denied as a motion to compel. However, the motion is granted to the extent that Defendants shall confer with him in some manner within twenty-one days.

confer with Plaintiff about his discovery request, and direct them to file another motion for summary judgment.

# I.
## A.

Plaintiff has been a religious adherent to the "Nation of Islam" during his incarceration at multiple VDOC prisons.[4] Plaintiff had been approved for the VDOC's Common Fare Diet ("Common Fare") on September 19, 2011. Common Fare is the VDOC's attempt at a uniform menu to accommodate inmates' various religious dietary beliefs at numerous VDOC facilities.

Plaintiff's religious beliefs limit the types of foods he eats. Plaintiff may eat nearly all vegetables, including Brussels sprouts, egg plant, asparagus, okra, squash, rhubarb, "broccoli, whitehead cabbage, cauliflower, spinach, rutabaga, garlic, onions, cucumbers, tomatoes, peppers, etc." However, Plaintiff may not eat collard greens, turnip salad, white potatoes, black-eyed peas, field peas, speckled peas, red peas, brown peas, split peas, beet top salads, kale mustard salads, cabbage sprouts, kidney beans, lima beans, pinto beans, butter beans, great northern beans, and soy beans. Plaintiff notes that lettuce, tomatoes, peppers, and onions may be consumed uncooked, whereas cabbage, broccoli, cauliflower, zucchini, squash, celery, cucumbers, and spinach need to be cooked.

Plaintiff also does not eat pork products, "scavengers of the sea, such as oysters, crabs, clams, snails, shrimps, eels, and catfish[,]" and any fish weighing more than fifty pounds. Plaintiff may not consume oils of any kind except vegetable oil, corn oil, olive oil, or pure butter. Plaintiff may eat butter beans; fish like mackerel, whiting, salmon, perch, white buffalo, channel trout, and tuna; and "properly raised and slaughtered" beef, chicken, lamb, and baby pigeon.

---

[4] During the times pertinent to this action, Plaintiff was housed at GRCC until September 22, 2015, when he was transferred to WRSP. Plaintiff left WRSP and returned to GRCC on July 28, 2016. Plaintiff was transferred to St. Brides Correctional Center sometime around July 2017.

2

Plaintiff may eat whole wheat bread but not cornbread, freshly baked breads, muffins, hot cakes, or white bread. Plaintiff may eat cream cheese "instead of other cheese on the market."

**B.**

Plaintiff presents six claims in the second amended complaint. The first five claims concern a substantial burden to his religious exercise, and the sixth claim concerns the time allowed to consume meals. Plaintiff seeks damages, declaratory, and equitable relief.

1.  Eid-ul-Adha Feast

The VDOC allows Muslim inmates to observe the Islamic holy day Eid-ul-Adha (the "Feast"), which occurs approximately two months after the Islamic holiday Ramadan. Plaintiff observed Ramadan while at GRCC, but he was subsequently transferred to WRSP.

The Feast was recognized by a celebratory meal at WRSP on September 25, 2015. Plaintiff had assumed that he would automatically be pre-approved to observe the feast at WRSP because he had participated in Ramadan at GRCC. Plaintiff did not know before the Feast that WRSP had special sign-up procedures in place requiring him to send a request for a Common Fare Feast tray to his counselor. Consequently, Plaintiff was offered a regular Common Fare tray and not a special Common Fare Feast tray on September 25, 2015. Plaintiff refused the regular Common Fare tray and skipped a meal that day. Plaintiff's faith allows him to make up a missed Feast, but his requests for a "make up" Feast were unsuccessful.

Plaintiff faults defendant Officer Witt for "intentionally and with callous disregard" to Plaintiff's religious rights by offering him the Common Fare tray and refusing to get him a Common Fare Feast tray. Plaintiff proffers that Witt should have consulted other staff and delivered a Common Fare Feast tray within thirty minutes. Plaintiff faults Warden Fleming for having "never placed any particular type of procedure to sign up for the . . . [F]east." Plaintiff

3

further faults Warden Fleming and Ponton, the VDOC's Western Region Administrator, for not authorizing a "make up" Feast meal.

2. Suspension from Common Fare

On December 15, 2015, Plaintiff received a generic notice that an Institutional Classification Authority ("ICA") hearing would be scheduled to determine his eligibility to remain on Common Fare. Plaintiff learned at the hearing that Sgt. Kimberlin had filed an incident report claiming he saw Plaintiff take a regular tray on November 26, 2015, in violation of the Common Fare Agreement ("Agreement"). Plaintiff denied taking a regular tray and denied ever seeing Sgt. Kimberlin in the dining hall that day. Plaintiff further argued that "even if he took a Thanksgiving tray from the window[,] it was not a regular tray, but a Special Observance tray and it did not violate the . . . Agreement." Plaintiff believed that there were no apparently unauthorized items on the Thanksgiving tray and that his faith allowed him to eat the Thanksgiving tray, regardless to whether it was classified as a non-Common Fare tray. Unit Manager Reynolds, who served as the ICA, determined Plaintiff violated the Agreement and recommended suspension from Common Fare.

Three days later, Plaintiff was suspended from Common Fare for six months. Thereafter on December 18, 2015, Plaintiff asked for no-meat trays, which still provided various foods his faith prohibited like biscuits, grits, crab cake, soy, unknown bread, and collard greens.

Plaintiff faults Sgt. Kimberlin for falsely identifying him as an inmate who took a Thanksgiving tray.[5] Plaintiff faults Reynolds for not producing a copy of the Agreement as evidence during the ICA hearing. Plaintiff faults Warden Fleming, Reynolds, and Assistant

---

[5] Plaintiff does not otherwise deny taking a special, purportedly non-regular "Thanksgiving tray" although he argues that taking it did not violate his personal religious beliefs or the Agreement.

4

Warden Combs for suspending him from Common Fare, and he faults Elam, a VDOC Western Region Administrator, for upholding the suspension via an administrative appeal.

3.  The Common Fare Menu, Regular Trays, and No-Meat Trays

WRSP staff implemented a new version of Common Fare in October 2015 that contained a "majority of the food items" that violates Plaintiff's religious beliefs. These unholy foods include "all types of beans, white potatoes, white rice, white bread[,] fresh hot cakes and carrots, . . . . French toast, toast, eggs, oatmeal, farina[,] . . . tuna cake and peanut butter (when they do not contain soy) and cabbage. . . ." Plaintiff unsuccessfully sought the following substitutions, all of which allegedly had been served on prior iterations of Common Fare: brown rice, navy beans, unbreaded fish, and alternate vegetables. Plaintiff notes that these substitutions are already provided during Islamic holidays. Plaintiff believes that there is "nothing Kosher about the Common Fare Diet as it exists now."[6] Plaintiff faults Engelke and Gregg for creating and implementing the new un-Kosher Common Fare. Plaintiff faults Warden Fleming, Warden Pearson, Broyles, Anderson, Creque, and Ponton for not correcting the issues after being informed via the administrative remedy process. Plaintiff faults Phillips and Tapps for their responses to his grievances.

Plaintiff explains he is forced to consume the prohibited foods because, if not, "he will suffer hunger pains [and] as a result [P]laintiff has suffered skin abrasions, bumps[,] and itching of the skin that did not occur until after consuming some prohibited foods, which is definitely punishment from Allah." Plaintiff also complains that the regular trays and no-meat trays violate

---

[6] Even though Common Fare served vegetables prohibited by his religion, he acknowledges it was a better alternative than regular trays and no-meat trays that serve mostly prohibited foods and are contaminated with pork substances.

his religious dietary needs by not serving acceptable foods and being "contaminated" with pork substances.

4. The Agreement

Inmates must apply for, and be approved for, Common Fare by a prison's ICA and the VDOC Central Classification Services. Inmates' applications are reviewed to determine whether they demonstrate a sincere religious need to consume foods served on Common Fare rather than foods served on the Master Menu. If approved for Common Fare, inmates are required agreeing to the rules of participation by reading and signing an Agreement. Inmates who refuse to sign may not receive Common Fare.

Violations of the Agreement include not picking-up a minimum of seventy five percent of meals served per month; being observed eating, trading, or possessing unauthorized food items not served on Common Fare trays; being observed giving away or trading a Common Fare food item; purchasing or being observed eating food items from the commissary inconsistent with the dietary requirements of Common Fare; and not attending services or other religious activities at least twice per month (if available). Violations result in the following sanctions: the first violation is six months' suspension, the second violation is twelve months' suspension, and the third or more violation is four years' suspension.

Plaintiff objects to having to sign the Agreement before receiving foods in conformity with his religious beliefs. Plaintiff complains that the Agreement creates its "own dietary laws and requirements that [P]laintiff is either forced to deal with or don't have anything to consume . . . [except for] prohibited food . . ., which forced [P]laintiff to violate his religious beliefs." Plaintiff also argues that the Agreement is designed to take away Plaintiff's religious diet "without regard to whether [P]laintiff violated any of his [own sincere] religious dietary laws."

Plaintiff further argues that the Agreement "forces [P]laintiff to attend a religion service even though that religious service may not be in conformance with the proper teachings or may differ on points of views that [P]laintiff sincerely does not agree with." Plaintiff also complains that the Agreement requires him to pick up at least 75% of his trays and "seeks to punish [P]laintiff for inaccurate record-keeping."

5.  Pork-Contaminated Trays

After being suspended from Common Fare, Plaintiff unwittingly touched a pork-contaminated tray on December 20, 2015. Plaintiff objected to receiving it and requested a non-pork tray, but an officer claimed that no-pork trays are "not available." Via an administrative grievance, Plaintiff informed Warden Fleming, who did not "correct it." Plaintiff requested and received non-pork trays two days later on December 22, 2015. Consequently, Plaintiff was forced for two days to forego meals or to contact and eat pork-contaminated foods.

6.  Time to Eat Meals

Plaintiff complains that he has only four to eight minutes to eat a meal in a segregation unit at WRSP before officers Sgt. Bryant, Sgt. Kimberlin, and Unknown Chow Hall Officers order Plaintiff to leave the dining hall. Plaintiff "had to get into the habit of forcing food down before the order was made to leave the dining hall or forgo eating a great portion of his meals and on some days he just got up with 90% of the food still left on his tray." Plaintiff acknowledges that "cram[ming] his food at the table without chewing and then swallow . . . within five minutes. . . . is a practice [P]laintiff had to become used to. . . ."

Plaintiff withdrew his grievance on the topic after Reynolds told him that the policy should allow him more time to eat and that the time would be increased.[7] When staff tried to increase the time, Sgt. Bryant, Sgt. Kimberlin, and Unknown Chow Hall Officers overrode the request and continued short dining times. Warden Fleming was informed via an administrative grievance but did not remedy the issue.

Plaintiff allegedly experiences indigestion, acid reflux, and heartburn as a result and takes the medicine Zantac "to alleviate the effects." Plaintiff also says that his "religious dietary laws forbid[] the cramming of food because the punishment is severe from Allah (God)[.]" Plaintiff fears that "cramming" will cause him cancer of the esophagus and "other related illnesses of the throat."

## II.
### A.

Defendants filed a motion for summary judgment, arguing, inter alia, that they are entitled to qualified immunity. Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993).

A party is entitled to summary judgment if the pleadings, the disclosed materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P.

---

[7] Per the grievance policy, a withdrawal meant that Plaintiff could not "be able to file any other grievance in the future about this issue."

56(a). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing admissible evidence and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A party is entitled to summary judgment if the admissible evidence as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conclusory statements and speculation are not enough to defeat a summary judgment motion. Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).

**B.**

Defendants are entitled to summary judgment as to damages sought for the RLUIPA claims and for official capacity claims via § 1983. RLUIPA does not authorize damages against a public official. See Sossamon v. Texas, 563 U.S. 277, 282 n.1, 293 (2011) (prohibiting damages claims against state officials in their official capacity); Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity); see also Washington v. Gonyea, 731 F.3d 143, 146 (2d Cir. 2013). Also, the Commonwealth of Virginia has not waived its sovereign immunity to § 1983 damages actions. See, e.g., Will v. Mich. Dep't of State Police, 491 U.S. 58,

9

71 (1989). Accordingly, Plaintiff cannot recover damages against Defendants in their official capacities or under RLUIPA.

## III.

Defendants argue that Plaintiff fails to establish a "substantial burden" to religious exercise protected under both the Free Exercise Clause of the First Amendment or RLUIPA.[8] Defendants are not persuasive, and their motion for summary judgment is denied in part for the religion claims.

The First Amendment's Free Exercise Clause and RLUIPA serve to protect the exercise of sincerely-held religious beliefs from being substantially burdened. To determine whether a plaintiff establishes a prima facie RLUIPA claim, a court must decide whether a plaintiff sincerely held the avowed belief and whether the belief is, in a plaintiff's own scheme of things, religious. United States v. Seeger, 380 U.S. 163, 185 (1965). Only a personal practice that is both sincerely held and rooted in religious belief falls under the protections of RLUIPA. See, e.g., Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005); Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972). A "substantial burden" on religious exercise protected by the First Amendment or RLUIPA occurs if it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand."[9] Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006); see, e.g., Patel v. Bureau of Prisons, 515 F.3d 807, 814 (8th Cir. 2008) ("When the significance of a

---

[8] Since it is helpful overall, I discuss the standards applicable to RLUIPA although qualified immunity is not applicable in the absence of an action for damages under RLUIPA.

[9] I assume for purposes of this opinion that Plaintiff's practices are personal that are both sincerely held and rooted in religious belief. See, e.g., Cutter v. Wilkinson, 544 U.S. 709, 725 (2005); see also 42 U.S.C. § 2000cc-5(7) (defining "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief").

10

religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA, and RLUIPA.").

For each of the six claims, Plaintiff avers to his sincere religious needs to not be rushed and to eat a particular diet. Plaintiff explains that by their acts, omissions, policies, or customs, Defendants force Plaintiff to forgo food to preserve his religious integrity or instead consume "unpure" foods, whether on Common Fare trays or not, too quickly. Plaintiff sincerely believes he could have eaten the Thanksgiving tray and observe a "make-up" Feast, and the decisions to suspend him from Common Fare and to not allow a make-up Feast constitute a substantial burden. Accordingly, Defendants' motion for summary judgment is denied in part, and they shall file another motion for summary judgment supported by affidavits.

## IV.

Plaintiff argues that the policy or custom requiring him to consume his meal in four to eight minutes constitutes cruel and unusual punishment. Defendants are entitled to qualified immunity and summary judgment for this claim.

"The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual punishments. If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment." Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993); see Monmouth Cnty. v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (discussing a serious medical need as a life-long handicap or permanent loss).

Plaintiff's alleged indigestion, acid reflux, and heartburn, all of which have been "alleviate[d]" with medicine, do not constitute a serious or significant physical injury. See, e.g., Watson-El v. Wilson, No. 08 C 7036, 2010 U.S. Dist. LEXIS 97481, at *34, 2010 WL 3732127,

at *13 (N.D. Ill. Sept. 15, 2010) ("The court finds as a matter of law that the plaintiff's acid reflex did not rise to the level of a serious medical need for purposes of Eighth Amendment analysis."); George v. Jones, No. C 06-2800 CW (PR), 2008 U.S. Dist. LEXIS 25506, at *25, 2008 WL 859439, at *8 (N.D. Cal. Mar. 28, 2008) ("[N]o reasonable jury could find that Plaintiff's mild heartburn is a serious medical need within the meaning of the Eighth Amendment."). Plaintiff's speculative fears of cancer or some other illness of the throat are similarly insufficient. See, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Even if any of these complaints could constitute a sufficient objective injury, Plaintiff fails to establish any defendant's deliberate indifference. Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. Farmer v. Brennan, 511 U.S. 825, 838 (1994); see Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990) ("Deliberate indifference may be demonstrated by either actual intent or reckless disregard."). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851-52; see Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'").

Nothing in the record supports an inference that a defendant was personally aware of facts indicating a substantial risk of serious harm for eating a meal quickly. Similarly missing is an inference that any defendant, after being personally aware of such, actually drew an inference that Plaintiff was exposed to a substantial risk of serious harm. Furthermore, having to eat a meal so quickly is not a condition of confinement that would be apparent, to a reasonable person

in any defendant's position, as a substantial risk of serious harm. Accordingly, Defendants are entitled to qualified immunity and summary judgment for the Eighth Amendment claim.

V.

Liberally construed, Plaintiff asserts that the administrative procedures and decisions causing his suspension from Common Fare for six months violate due process guaranteed by the Fourteenth Amendment. Plaintiff fails to establish that a defendant violated clearly established law about due process before suspending him, and consequently, Defendants are entitled to qualified immunity for these claims.

Plaintiff's temporary six-month suspension from Common Fare is not such an "atypical and significant hardship in relation to the ordinary incidents of prison life." See, e.g., Sandin v. Conner, 515 U.S. 472, 484 (1995); see also Incumaa v. Stirling, 791 F.3d 517, 526-27 (4th Cir. 2015) (recognizing the length of deprivation impacts whether a hardship is atypical and significant). Furthermore, Plaintiff's "private interest affected" is slight because Plaintiff does not allege he has been completely deprived of religious practice, and Plaintiff does not establish anything more than a slight risk of a temporary erroneous deprivation using current procedures, which includes administrative review. See, e.g., Mathews v. Eldridge, 424 U.S. 319, 335 (1996). In light of these two factors, Plaintiff's argument that video recordings should be used to adjudicate Common Fare violation hearings is not sufficiently persuasive to demonstrate a violation of clearly established law. See, e.g., id.; Awe v. Va. Dep't of Corr., Civil Action No. 7:12-cv-00546, 2013 U.S. Dist. LEXIS 161227, at *10, 2013 WL 5988869, at *3 (W.D. Va. Nov. 12, 2013) ("Requiring every staff's allegation of inmate misconduct to be established by a video recording would disrupt the orderly operation of a prison."), aff'd, 564 F. App'x 54 (4th Cir. 2014).

Moreover, Plaintiff does not contest that he received advance notice of the proceedings, had an opportunity to call witnesses and present evidence, and had a neutral fact finder determine the accusation. See, e.g., Wolff v. McDonnell, 418 U.S. 539, 564-71(1974). While he challenges the ultimate decision to suspend him, the record establishes that there was "some evidence" in the administrative record to support the decision based on Sgt. Kimberlin's report.[10] See, e.g., Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455-56 (1985). Accordingly, Plaintiff fails to establish a violation of a clearly established procedural or substantive due process right, and Defendants' motion is granted as to qualified immunity. See, e.g., Pink v. Lester, 52 F.3d 73, 75 (4th Cir.1995).

## VI.

For the foregoing reasons, I grant in part and deny in part Defendants' motion for summary judgment, direct them to respond to Plaintiff's discovery request, and direct them to file another motion for summary judgment.

**ENTER**: This 22nd day of March, 2018.

Jackson L. Kiser
Senior United States District Judge

---

[10] Whether Sgt. Kimberlin intentionally deprived Plaintiff of a religious right with a false accusation is a different question than the one presented as a due process challenge.