
CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 2 6 2019

JULIA C. DUDLEY, CLERK
BY: /s/ H McDonald
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| WALTER DELANEY BOOKER, | ) | |
| Plaintiff, | ) | Civil Action No. 7:16cv00084 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| M.E. ENGELKE, et al., | ) | By: Hon. Jackson L. Kiser |
| Defendants. | ) | Senior United States District Judge |

Walter Delaney Booker, a Virginia inmate proceeding pro se, filed a verified second amended complaint [ECF No. 42-1] pursuant to 42 U.S.C. §§ 1983 and 2000cc-1, et seq., naming several officials within Virginia Department of Corrections ("VDOC"), Wallens Ridge State Prison ("WRSP"), and Greensville Correctional Center ("GRCC") as defendants.[1] Plaintiff's remaining claims assert that Defendants substantially burdened his sincere religious exercise in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (See Mem. Op. & Order, Mar. 22, 2018 [ECF Nos. 67, 68].) Defendants filed a supplemental motion for summary judgment and brief in support [ECF Nos. 72, 73], and Plaintiff responded [ECF No. 78], making the matter ripe for disposition. After reviewing the record, I grant Defendants' supplemental motion for summary judgment and dismiss the action in its entirety.

---

[1] The pleading consists of 253 paragraphs, not including sub-paragraphs. Plaintiff also filed a "second declaration" [ECF No. 4] and "third declaration" [ECF No. 11] in support of the pleading. Exhibits A-D [ECF No. 1-1] were included with the original verified complaint, and exhibits F-1 [ECF Nos. 42-2 to 42-4], were included with the amended complaint. There does not appear to be an Exhibit E.

## I.

### A.

Plaintiff has been a religious adherent to the "Nation of Islam" during his incarceration at multiple VDOC prisons.[2] Plaintiff was approved for the VDOC's Common Fare Diet ("Common Fare") on September 19, 2011. Common Fare is the VDOC's attempt at a uniform menu to accommodate inmates' various religious dietary beliefs at numerous VDOC facilities. Plaintiff's religious beliefs limit the kinds of foods he eats. He may eat nearly all vegetables except for peas, collard greens, cabbage sprouts, and salads made from beet tops, turnip greens, or kale mustard greens. Kidney beans, lima beans, pinto beans, butter beans, great northern beans, and soy beans are also off limits. Lettuce, tomatoes, peppers, and onions may be consumed uncooked, but cabbage, broccoli, cauliflower, zucchini, squash, celery, cucumbers, and spinach must be cooked. Plaintiff also does not eat pork products, "scavengers of the sea, such as oysters, crabs, clams, snails, shrimps, eels, and catfish[,]" or any fish weighing more than fifty pounds. He may not consume oils of any kind except vegetable oil, olive oil, or pure butter. He may eat whole wheat bread, but not cornbread, freshly baked breads, muffins, hot cakes, or white bread. "[P]roperly raised and slaughtered" beef, chicken, lamb, and baby pigeon are also permissible.

### B.

Plaintiff's five remaining claims assert that the named Defendants "substantially burdened" his sincere religious exercise, namely his ability to eat a diet consistent with his own religious scruples, in violation of the First Amendment's Free Exercise Clause and the Religious Land Use

---

[2] During the times pertinent to this action, Plaintiff was housed at GRCC until September 22, 2015, when he was transferred to WRSP. Plaintiff left WRSP and returned to GRCC on July 28, 2016. He was transferred to St. Brides Correctional Center sometime around July 2017.

and Institutionalized Persons Act ("RLUIPA").[3] Under the Free Exercise Clause and RLUIPA, the Government "substantially burdens" religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of [his] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006); see Patel v. B.O.P., 515 F.3d 807, 814 (8th Cir. 2008) ("When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause . . . and RLUIPA."). Plaintiff seeks damages against Defendants in their individual capacities under 42 U.S.C. § 1983, as well as injunctive relief against Defendants in their official capacities under § 1983 and RLUIPA.[4]

1. Eid-ul-Adha Feast

The VDOC allows Muslim inmates to observe the Islamic holy day Eid-ul-Adha (the "Feast"), which occurs approximately two months after Ramadan, the holy month of fasting. Plaintiff participated in Ramadan while at GRCC, including in 2015. He was transferred to WRSP on September 23, 2015, two days before the Feast would be celebrated at WRSP with a pre-prepared Common Fare Feast lunch. Plaintiff assumed he would automatically be approved to observe the Feast at WRSP because he participated in Ramadan at GRCC. However, his name was not on the list of approved participants when lunch was served on September 25, so he was offered

---

[3] Defendants do not dispute that Plaintiff seeks to engage in a personal practice that is both sincerely held and rooted in religious belief.

[4] I previously granted judgment in Defendants' favor on Plaintiff's claims seeking damages under RLUIPA, as well as his § 1983 claims seeking damages against Defendants in their official capacities. (Mem Op. pgs. 9–10, Mar. 22, 2018 [ECF No. 67].) I also held that Defendants were entitled to qualified immunity on Plaintiff's § 1983 claims alleging violations of the Eighth and Fourteenth Amendments. (Id. pgs. 11–14.)

a regular Common Fare tray rather than the special Common Fare Feast tray. Plaintiff refused the regular Common Fare tray and skipped lunch that day. Plaintiff's faith allows him to make up a missed Feast, but his requests for a "make up" Feast in the fall of 2015 were unsuccessful. WRSP officials did offer Plaintiff a "make up" Feast nearly three years later, in July 2018, but Plaintiff declined because he was in the middle of another religious fast.

Plaintiff faults defendant Corrections Officer Witt for acting "intentionally and with callous disregard" to Plaintiff's religious rights by offering him the regular Common Fare tray and refusing to get him a Common Fare Feast tray after Plaintiff told Witt that he was supposed to receive the Eid-al-Adha Feast tray because he is Muslim. He proffers that Witt should have consulted other WRSP staff and given a Common Fare Feast tray to Plaintiff within thirty minutes. Plaintiff faults defendant WRSP Warden Fleming for having "never placed any particular type of procedure to sign up for the . . . [F]east." Plaintiff further faults Fleming and Defendant Ponton, one of VDOC's Western Region Administrators, for not authorizing a "make up" Feast meal in 2015.

2. Suspension from Common Fare Meal Plan

On December 15, 2015, Plaintiff received notice that an Institutional Classification Authority ("ICA") hearing would be scheduled to determine whether he could continue receiving Common Fare. At the hearing, Plaintiff learned that defendant Sgt. Kimberlin had filed an incident report claiming that on November 26, 2015, he saw Plaintiff take a regular meal tray in violation of the Common Fare Agreement ("Agreement"). Plaintiff denied taking a regular tray and denied seeing Sgt. Kimberlin in the dining hall that day. Plaintiff further argued that "even if he took a Thanksgiving tray from the window[,] it was not a regular tray, but a Special Observance tray and it did not violate the . . . Agreement." Plaintiff believed that his faith allowed him to eat the

Thanksgiving meal, regardless of whether it was classified as a non-Common Fare tray. Defendant Unit Manager Reynolds, who served as the ICA, determined Plaintiff violated the Agreement and recommended he be suspended from Common Fare. He was suspended from Common Fare for six months beginning on December 18, 2015. Plaintiff faults Defendant Sgt. Kimberlin for intentionally interfering in his religious exercise by falsely accusing Plaintiff of taking an unauthorized meal tray. He also faults Fleming, Reynolds, and Defendant WRSP Assistant Warden Combs for suspending him from Common Fare, as well as Defendant Elam, another of VDOC's Western Region Administrators, for upholding the suspension via an administrative appeal.[5]

3. Changes to Common Fare Menu, Regular Trays, and No-Meat Trays

In October 2015, the VDOC implemented a new Common Fare menu featuring a "majority of the food items" that Plaintiff believes violate his religious beliefs. These unholy foods include "all types of beans, white potatoes, white rice, white bread[,] fresh hot cakes and carrots, . . . . French toast, toast, eggs, oatmeal, farina[,] . . . tuna cake and peanut butter (when they do not contain soy) and cabbage . . . ." Plaintiff unsuccessfully sought the following substitutions, all of which allegedly had been served during earlier iterations of Common Fare: brown rice, navy beans, unbreaded fish, and different vegetables. Plaintiff notes that these substitutions are already provided during Islamic holidays. He believes that there is "nothing Kosher about the Common Fare Diet as it exists now."[6] Plaintiff faults Defendant Engelke, the VDOC's Director of Food

---

[5] I previously held that Defendants were entitled to qualified immunity on Plaintiff's separate § 1983 claim challenging this suspension on due-process grounds. (See Mem. Op. pgs. 13–14 & n.10, Mar. 22, 2018 [ECF No. 67]).

[6] Even though Common Fare served vegetables prohibited by his religion, Plaintiff acknowledges it was a better alternative than regular trays and no-meat trays that serve mostly prohibited foods and are contaminated with pork substances.

Services, and Defendant Gregg, the State Dietician, for creating and implementing the new un-Kosher Common Fare menu. He faults Defendants Fleming, Pearson, Broyles, Anderson, Creque, and Ponton for not correcting these issues after being informed via the administrative grievance process. Defendant Pearson was GRCC's Warden, Defendant Broyles was the Food Operations Manager at WRSP, Anderson was the Food Operations Director at GRCC, and Defendant Creque was the Food Operations Manager and Supervisor at GRCC. Plaintiff also faults Defendants Phillips and Tapps, both institutional ombudsmen at GRCC, for their responses to his grievances.

4. The Agreement

To participate in Common Fare, inmates must apply and be approved by their prison's ICA, as well as the VDOC's Central Classification Services. Inmates' applications are reviewed to determine whether they demonstrate a sincere religious need to consume foods served on Common Fare rather than foods served on the Master Menu. If approved for Common Fare, inmates must agree to the rules of participation by reading and signing an Agreement. Inmates who refuse to sign the Agreement will not receive Common Fare.

Before June 2018, violations of the Agreement included: failing to take at least seventy-five percent of meal trays served in any given month; being observed eating, trading, or possessing unauthorized food items not served on the Common Fare menu; being observed giving away or trading a Common Fare food item; purchasing or being observed eating food items from the commissary inconsistent with the dietary requirements of Common Fare; and failing to attend services or other religious activities at least twice per month, if available at the inmate's facility. Breaking any one of these rules would result in the following sanctions: the first violation was six months' suspension, the second violation was twelve months' suspension, and the third (or more)

violation was four years' suspension from Common Fare. The Agreement was revised in March and June 2018. Although inmates who request the Common Fare diet must still sign an Agreement promising to not pick up or eat a non-Common Fare meal tray, and to not trade or possess unauthorized food items from the main line, they are no longer required to pick up a certain number of Common Fare trays each month or to attend religious services in order to stay on the Common Fare meal plan. Additionally, involuntary removal or suspension from Common Fare is no longer a permissible sanction for violating the Agreement. Rather, the inmate shall be assessed the cost of the Common Fare meal, which is currently $0.70 per meal, for each violation. An inmate who cannot afford to pay for the meal will have the cost charged as a loan to his Inmate Trust Account.

Plaintiff objects to having to sign the Agreement before receiving foods in conformity with his religious beliefs. He complains that the Agreement creates its "own dietary laws and requirements that [P]laintiff is either forced to deal with or don't have anything to consume . . . [except for] prohibited food . . . , which forced [P]laintiff to violate his religious beliefs." He also argues that the old Agreement was designed to take away his religious diet "without regard to whether [P]laintiff violated any of his [own sincere] religious dietary laws." He further argues that the former Agreement forced "[P]laintiff to attend a [religious] service even though that religious service may not be in conformance with the proper teachings or may differ on points of views that [P]laintiff sincerely does not agree with." He asserts this claim against Defendant Engelke, whose signature is on the Agreement.

5. <u>Pork-Contaminated Trays</u>

On December 20, 2015, shortly after being suspended from Common Fare, Plaintiff unwittingly touched a pork-contaminated tray that was offered to him during a meal. He objected

to receiving it and requested a non-pork tray, but an officer claimed that such trays were "not available." Via an administrative grievance, Plaintiff informed Warden Fleming, who did not "correct" this problem. Plaintiff requested and received non-pork trays on December 22, 2015. Consequently, Plaintiff was forced for two days to forego meals or to contact and eat pork-contaminated foods. He asserts this claim against Defendants Fleming, Reynolds, Broyles, and Combs.

### C.

Defendants moved for summary judgment on all of Plaintiff's remaining claims. They claim to be entitled to judgment as a matter of law because: Plaintiff cannot show certain Defendants were personally involved in the alleged deprivations; the new Common Fare Agreement moots Plaintiff's claims for prospective injunctive relief under RLUIPA; and Plaintiff's religious exercise was not "substantially burdened" by missing one Eid-ul-Adha Feast meal, receiving two pork-contaminated meals trays; being suspended from Common Fare after violating the former Agreement; dealing with changes to the Common Fare menu; or being required to sign the Agreement. Alternatively, Defendants assert that the challenged policies pass muster under both RLUIPA and the Free Exercise Clause. (See generally Defs.' Br. in Supp. of Suppl. Mot. for Summ J. pgs. 10–35, July 20, 2018 [ECF No. 73].)

### II.

Federal Rule of Civil Procedure 56 provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In order to preclude

summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." Id. at 250. In considering a motion for summary judgment, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

A court must grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. The nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. Glover v. Oppleman, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001). The trial judge has an "affirmative obligation" to "prevent 'factually unsupported claims and defenses' from proceeding to trial." Id. (quoting Celotex, 477 U.S. at 317).

### III.

#### A.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). While the allegations or evidence necessary to proceed with a claim under § 1983 "will vary with the constitutional provision at issue," a plaintiff must at least establish "that each Government-official defendant, through the official's own actions [or omissions], has violated the Constitution." See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Likewise, RLUIPA requires the plaintiff to show

that the named defendant was in fact responsible for the challenged policy, action, or omission that allegedly imposed a substantial burden on the plaintiff's religious practice. See Lovelace v. Lee, 472 F.3d 174, 193 (4th Cir. 2006). Both statutes also require the plaintiff to show that the official acted with the requisite intent. Negligent actions or omissions that happen to deprive the plaintiff of his rights do not give rise to liability under either statute. See Daniels v. Williams, 474 U.S. 327, 330 (1986) (42 U.S.C. § 1983); DePaola v. Va. Dep't of Corrs., No. 7:12cv592, 2013 WL 6804744, at *4 (W.D. Va. Dec. 20, 2013) (RLUIPA).

Plaintiff does not sufficiently allege that Defendants Anderson, Broyles, Combs, Creque, Elam, Fleming, Parsons, Phillips, Ponton, and Tapps were personally involved in any of the events giving rise to his remaining claims for relief. Rather, each of these Defendants, all higher-level officials at GRCC, WRSP, or the VDOC headquarters, is alleged to have received Plaintiff's grievances complaining about the events giving rise to these claims, and, according to Plaintiff, failed to take appropriate corrective action. "Generally, prison officials are absolutely immune from liability stemming from their participation in the inmate grievance process." Blount v. Phipps, No. 7:11cv594, 2013 WL 831684, at *5 n.12 (W.D. Va. Mar. 6, 2013) (citing Burst v. Mitchell, 589 F. Supp. 186, 192 (E.D. Va. 1984)); see also Lowery v. Edmondson, 528 F. App'x 789, 792 (10th Cir. 2013) ("[T]he mere denial of a grievance . . . is inadequate for personal participation" under both § 1983 or RLUIPA). "Even after considering their grievance responses, Plaintiff fails to establish that [these Defendants] . . . were personally involved in any alleged violation of federal rights, either directly or through another's conduct in execution of their policies or customs."[7] Washington v. McAuliffe, No. 7:16cv476, 2018 WL 401903, at *9 (Jan. 12, 2018) (citing Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)). "Allegations of negligent investigation

---

[7] See generally ECF No. 1-1, at 18–37; ECF No. 11, at 3–9.

or respondeat superior are not sufficient." Id.; see also Brown v. Mathena, No. 7:14cv20, 2014 WL 4656378, at *2 (W.D. Va. Sept. 16, 2014). Accordingly, Defendants Anderson, Broyles, Combs, Creque, Elam, Fleming, Parsons, Phillips, Ponton, and Tapps are entitled to judgment as a matter of law in their favor on all remaining claims. Fed. R. Civ. P. 56(a).

**B.**

Defendants next argue that Plaintiff's RLUIPA claims seeking to enjoin enforcement of "the penalty and sanctions and other parts of the suspension process" related to the Common Fare meal plan are moot because the current Common Fare Agreement, which went into effect in June 2018, no longer requires that inmates pick up a certain number of Common Fare trays each month or attend religious services in order to stay on the Common Fare meal plan. Additionally, inmates will no longer be involuntarily removed or suspended from this program. Rather, an inmate who is caught with a non-Common Fare meal tray, or trading or possessing unauthorized food items from the main line, will be assessed the cost of the Common Fare meal, which is currently $0.70. Plaintiff objects that these claims are not moot because he still must sign the Agreement to receive a diet consistent with his religious scruples and Defendants have not shown that it is "absolutely clear that the allegedly wrongful behavior could not be expected to recur." (Pl.'s Br. in Opp'n 31 (citing Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., 528 U.S. 167, 189 (1982) (discussing the Article III "mootness" standard)).)

RLUIPA has a "safe harbor provision" that allows the government to avoid court-ordered prospective injunctive relief under this specific statute "'by changing the policy or practice that results in a substantial burden'" on the plaintiff's sincere religious exercise. Phillips v. S.C. Dep't of Corrs., No. 8:14cv2269, 2015 WL 4727028, at *5 (D.S.C. Aug. 10, 2015) (quoting 42 U.S.C. § 2000cc-3(e)); cf. United States v. Cty. of Culpeper, Va., No. 3:16cv83, 2017 WL 3835601, at *8

(W.D. Va. Sept. 1, 2017) ("The safe harbor provision embodies a congressional policy against federal micromanagement of a locality's land use decisions, as long as the underlying RLUIPA violation has been cured."). Here, there is no dispute that the VDOC has removed the challenged provisions from its Common Fare Agreement and food services policy. Cf. Pogue v. Woodford, No. Civ S-05-1873, 2009 WL 2777768, at *9 (E.D. Cal. Aug. 26, 2009) ("Because the changed, current regulations cannot be reasonably challenged as infringing on plaintiff's religious practice/beliefs, plaintiff may not receive any prospective relief." (citing 42 U.S.C. § 2000cc-3(e)); Boles v. Neet, 402 F. Supp. 2d 1237, 1240–41 (D. Colo. 2005) (concluding there was "no serious factual dispute" that the state department of corrections came within RLUIPA's safe harbor provision, therefore mooting plaintiff's claim for injunctive relief, by changing the challenged policy to allow Jewish inmates to wear religious garb while being transported outside the prison). Although Plaintiff still must sign the Agreement to participate in the program, this requirement does "not impose any burden" on his sincere religious exercise, Blount v. Ray, No. 7:08cv504, 2009 WL 2151331, at *6 (W.D. Va. July 19, 2009), much less the "substantial burden" necessary to show a prima facie violation of RLUIPA. Accordingly, Plaintiff's requests for prospective injunctive relief under RLUIPA in Claims Two and Four will be dismissed.

Additionally, although Defendants have not raised the issue, the Court must consider whether the new Common Fare Agreement also moots Plaintiff's claims for prospective injunctive relief under § 1983, since Plaintiff is not now subject to the policies and practices challenged in this lawsuit.[8] "It is well established that a defendant's 'voluntary cessation of a challenged practice'

---

[8] Plaintiff also seeks retrospective injunctive relief in the form of a court order "expunging [P]laintiff's religious diet record" showing that he violated the Agreement in December 2015. (Am. Compl. 37.) I previously held that Plaintiff had failed "to establish a defendant violated clearly established law about due process before suspending him" from the Common Fare plan, and "that there was 'some evidence in the administrative record to support the [suspension] decision based on Sgt. Kimberlin's report." (Mem. Op. at 13–14, Mar. 22, 2018 [ECF No. 67]). Although Plaintiff's Free Exercise Clause claim for damages

moots an action"—thereby depriving the federal court of its constitutional authority to entertain the case—"only if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014) (quoting Friends of the Earth, 528 U.S. at 189); see also Porter v. Clarke, 852 F.3d 358, 363–64 (4th Cir. 2017). "The heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." Wall, 741 F.3d at 497 (quoting Friends of the Earth, 528 U.S. at 189). "Here, nothing bars the [VDOC] from reverting to the challenged policies in the future," Porter, 852 F.3d at 365, the named Defendant who oversees this particular program "failed to even offer a bald conclusory pledge not to return to such policies," Prison Legal News v. Stolle, 319 F. Supp. 3d 830, 838 (E.D. Va. 2015), and, given the frequency with which VDOC officials review their policies on religious accommodations, there is a least "some degree of doubt that the new policy will remain in place for long," Wall, 741 F.3d at 497. Accordingly, Plaintiff's requests for prospective injunctive relief, under 42 U.S.C. § 1983, in Claims Two and Four are not moot.

## C.

Defendants moved for summary judgment on all five of Plaintiff's remaining claims, arguing that Plaintiff cannot show the challenged conduct and policies imposed a "substantial burden" on his religious exercise, and, in the alternative, that the policies pass muster under both RLUIPA and the First Amendment's Free Exercise Clause.

As noted, the Government "substantially burdens" religious exercise protected by the First Amendment or RLUIPA when it "put[s] substantial pressure on an adherent to modify his

---

against Sgt. Kimberlin in his individual capacity remains (id. at 14 n.10), "the law is clear that individuals sued in their official capacity as state agents cannot be held liable for . . . retrospective injunctive relief," Lewis v. Bd. of Educ. of Talbot Cty., 262 F. Supp. 2d 608, 612 (D. Md. 2003) (collecting cases). Accordingly, Plaintiff's request for an order expunging his prison disciplinary record will be dismissed.

behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of [his] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." Lovelace, 472 F.3d at 187. "No substantial burden occurs if the government action merely makes the 'religious exercise more expensive or difficult,' but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion." Estes v. Clarke, 7:15cv155, 2018 WL 2709327, at *5 (W.D. Va. June 5, 2018) (quoting Living Water Church of God v. Charter Twp. of Meridian, 258 F. App'x 729, 739 (6th Cir. 2007)). Additionally, because neither the First Amendment nor RLUIPA protects against negligent conduct that happens to interfere with religious exercise, the plaintiff must show that the named Defendant acted or failed to act with the requisite intent. See Daniels, 474 U.S. at 330; DePaola, 2013 WL 6804744, at *4.

1. Eid-ul-Adha Feast

There is no dispute that Plaintiff signed up for and observed Ramadan in the summer of 2015 while housed at GRCC. Had Plaintiff remained at GRCC, he would have "automatically be[en] included in the Eid-ul-Adha feast" when it was celebrated in late September 2015. [ECF No. 55-1, at 36.] Plaintiff was transferred from GRCC to WRSP on September 22, two days before the latter facility planned to serve the Eid-ul-Adha feast. Plaintiff asserts that on September 24, he asked WRSP "counselors and officers" about the upcoming feast, but all stated that "they did not know what Plaintiff was talking about." (Am. Compl. ¶ 47; see also Pl.'s Br. in Opp'n 6–7.) Under VDOC policy, unspecified officials at WRSP should have consulted a central record-keeping program to determine whether Plaintiff "participated in Ramadan . . . at [his] prior facility" and then added him "to the Eid-ul-Adha observance" list for WRSP "when participation has been verified." [ECF No. 55-1, at 36.] This policy did not provide any timeframe within which the

WRSP officials should have acted. VDOC policy also instructed that any inmate "who is approved for Common Fare and transfers into an institution that offers Common Fare should begin receiving Common Fare meals as soon as practical, [but] no later than 7 days after arrival at the institution." [ECF No. 55-1, at 22.]

Unfortunately, Plaintiff's name was not on the list of Eid-ul-Adha Feast participants when Defendant Witt delivered lunch trays on September 25, 2015. (Am. Compl. ¶¶ 49–50.) When Plaintiff told Witt "that he is supposed to receive a feast tray because he is Muslim," Witt responded that Plaintiff was "not receiving a feast tray." (Id. ¶ 50.) Witt declined to contact other prison officials, and instead told another officer that Plaintiff could choose between the regular Common Fare tray and "no tray at all." (Id. ¶ 51.) "Plaintiff refused the tray because it was not the [Feast] observance tray required," and eating a non-Feast meal would have violated this important Holy Day practice. (Id. ¶ 53.) Defendant Witt does "not recall th[is] incident," but avers that he "would have been delivering trays in accordance with a list provided by [the] Food Service Department." (Witt Aff. ¶ 4 [ECF No. 73-4].) Witt did not have authority to change an inmate's meal tray. (See id.) Although Plaintiff concludes that "Witt acted intentionally and with callous disregard" to his free-exercise rights (Am. Compl. ¶ 55), Plaintiff does not dispute that his name was not on Witt's "list stating who to give the [Feast] tray to" on September 25, 2015 (id. at ¶ 49). (See also Pl.'s Br. in Opp'n 7; Pl.'s Fourth Decl. 3–7 [ECF No. 60-1].)

Accepting Plaintiff's assertions as true, Officer Witt's refusal to give Plaintiff the Common Fare Feast tray was at most negligent—and more likely an isolated record-keeping error for which Officer Witt was not responsible. See DePaola, 2013 WL 6804744, at *4; Talbert v. Jabe, No. 7:07cv450, 2007 WL 3339314, at *16 (W.D. Va. Nov. 8, 2007) (dismissing prisoner's Free Exercise claim because "the isolated incidents plaintiff complains of indicate a lack of intent on

the part of defendants," as required to plausibly allege a constitutional violation). There is no competent evidence in the record showing that Plaintiff's name was on WRSP's list of Feast participants, and Plaintiff does not present any evidence why Officer Witt should have disregarded the Food Services list and taken Plaintiff's word for it that he "was supposed to receive a feast tray." (Am. Comp. ¶¶ 49–50.)

Moreover, Plaintiff has not presented any evidence showing that "missing one feast meal rises to the level of a 'substantial burden'" under the Free Exercise Clause. Cf. DePaola, 2013 WL 6804744, at *4 (holding the same under RLUIPA's more demanding "substantial burden" test, which focuses exclusively on the specific religious exercise in question rather than the inmate's ability to practice his religion by alternative means). "He does not assert that his religious exercise was so encumbered that he was forced to modify or abandon his religious beliefs," id., or required to eat food that violated his Holy Day practice. Rather, Plaintiff declined the regular Common Fare tray and skipped lunch that day. Accordingly, Defendants' supplemental motion for summary judgment will be granted on this claim.

2. The Agreement & Six Month Suspension

VDOC officials "are clearly entitled to . . . implement[] procedures governing the administration of the agency's religious diet accommodations for inmates." Blount, 2009 WL 2151331, at *6. The fact that Plaintiff had to sign the Common Fare Agreement and follow certain rules to receive a specially prepared religious diet, without more, did not impose a substantial burden on his religious exercise. Id. Defendants also assert that Plaintiff's temporary suspension from Common Fare did not substantially burden his religious exercise because he could supplement his vegetarian diet with Halal/Kosher food through the prison's commissary—being suspended from the Common Fare plan did not force Plaintiff to choose between going hungry,

on the one hand, and eating food that violated his religious beliefs, on the other. (See Engelke Suppl. Aff. ¶ 6 [ECF No. 73-3].) Plaintiff responds that he could not afford to purchase food from the commissary, and that he should not have to spend his limited resources for food instead of purchasing other items or calling his family. (Pl.'s Br. in Opp'n 10.)

The fact that Halal/Kosher food "remained available to [P]laintiff, albeit at a cost, appears to negate any claim that [his] temporary removal from Common Fare constituted a substantial burden on his religious practice, since he retained another means for observing his religious dietary laws" during this six-month period. Hammer v. Keeling, No. 1:14cv8, 2015 WL 925880, at *6 (E.D. Va. Mar. 3, 2015) (citing Krieger v. Brown, 496 F. App'x 322 (4th Cir. 2012)). Accordingly, Defendants' supplemental motion for summary judgment will be granted on these claims.

3. New Common Fare Menu

Although not entirely clear, the gravamen of Plaintiff's claim challenging the VDOC's new Common Fare menu seems to be that the meals did not fully align with Plaintiff's personal, subjective views of which foods were or were not consistent with his religious dietary laws. (See, e.g., Am. Compl. ¶¶ 104–12, 119, 121.) He asserts that VDOC officials could have granted his requests to substitute other foods consistent with Plaintiff's religious views, such as serving brown rice instead of white rice, and navy beans in place of "all other beans." (Id. ¶ 109.) Plaintiff alleges that he "has consume[d] some of the prohibited foods" so he would not "suffer hunger pains" (id. ¶ 116), but he has not presented any evidence that he was "forced to consume" food he genuinely believed to be "at odds with his religious . . . diet," Muhammad v. Mathena, No. 7:14cv134, 2015 WL 300363, at *3 (W.D. Va. Jan. 22, 2015).

However, assuming Plaintiff's sworn allegations describing the new menu's problems create "a genuine factual dispute as to whether Defendants' actions in preventing him from

receiving meals in compliance with his dietary restrictions substantially burdened his ability to practice his religion," Carter v. Fleming, 879 F.3d 132, 140 (4th Cir. 2018), Defendants also assert Plaintiff cannot show that the new Common Fare menu was unreasonable or not related to a legitimate penological interest (see Defs.' Br. in Supp. 29; Engelke Aff. ¶¶ 3–6; Robinson Aff. ¶¶ 4–5 [ECF No. 73-1].) The Free Exercise Clause "forbids the adoption of laws designed to suppress religious beliefs or practices," Wall, 741 F.3d at 499, including those governing life behind prison walls. However, a neutral and generally applicable prison policy that substantially burdens an inmate's sincere religious exercise is nonetheless constitutional if it is "reasonably adapted to achieving a legitimate penological" interest. Id. At trial, Plaintiff would bear the burden of proving that the VDOC's new Common Fare menu was not reasonably adapted to achieving a legitimate penological interest. Jehovah v. Clarke, 798 F.3d 169, 176 (4th Cir. 2015) (citing Overton v. Bazzetta, 539 U.S. 126, 132 (2003)).

> The governing test for constitutionally asks:
>
> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; *and* (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

Lovelace, 472 F.3d at 200 (quoting Turner v. Safley, 482 U.S. 78, 89–92 (1987)) (emphasis added) (internal brackets omitted). Here, Defendants assert that the VDOC's Common Fare menu is designed to balance inmates' differing religious dietary restrictions with the agency's "operational, budgetary, and administrative concerns" (Robinson Aff. ¶¶ 4–5), including their obligation to provide adequate nutrition and caloric intake. Because these meals are purchased and prepared in bulk, the VDOC cannot "tailor individual trays for each prisoner" who participates in Common Fare. (Engelke Aff. ¶ 6.) The VDOC does serve navy beans and brown rice during Ramadan and

other Muslim holidays, but those substitutions are "more costly" and it is not "cost efficient to offer these food items as substitutes throughout the year." (Id.) Several federal district courts in Virginia have concluded that the VDOC's standardized Common Fare menu is reasonably adapted to achieving legitimate penological interests in cost-efficiency, uniformity, and maintaining good order while trying to accommodate different religious dietary needs. See Shabazz v. Johnson, No. 3:12cv282, 2015 WL 4068590, at *13–15 (E.D. Va. July 2, 2015) (collecting cases); Lovelace v. Bassett, No. 7:07cv506, 2009 WL 3157367, at *8 (W.D. Va. Sept. 29, 2009 ("The administrative decision to standardize accommodation of inmates' religious dietary needs throughout the VDOC . . . is just the kind of prison policy-making determination to which courts must defer.").

Plaintiff generally responds that Engleke's attestations are inaccurate and that using Plaintiff's suggested substitutions would be cheaper, but he does not point to any admissible evidence to support these allegations. Accordingly, Defendants' supplemental motion for summary judgment will be granted on this clam.

4. Two Pork-Contaminated Trays

On December 20, 2015, shortly after being suspended from Common Fare, Plaintiff unwittingly touched a pork-contaminated tray that was offered to him during a meal. He objected to receiving it and requested a non-pork tray, but an officer claimed that such trays were "not available." Plaintiff requested and received non-pork trays on December 22, 2015. Consequently, Plaintiff was forced for two days to forego meals or to contact and eat pork-contaminated foods. As with his Eid-ul-Ahda Feast claim, the "isolated incidents" Plaintiff complains of here "indicate a lack of intent on part of [D]efendants," Talbert, 2007 WL 3339314, at *16, none of whom were even personally involved in giving him the meal trays. Moreover, Plaintiff does not explain how Plaintiff inadvertently touching the pork-contaminated tray before realizing what it was constitutes

government action that substantially burdened his religious exercise. Cf. Fields v. Robinson, No. 3:15cv455, 2017 WL 253955, at *4 (E.D. Va. Jan. 19, 2017) ("[E]ven if one assumed the lack of a Common Fare diet substantially burdened Fields's religious exercise, any RLUIPA claim would fail, as the burden on [his] religious exercise flows from Fields's own failure to reapply for the diet, rather than any state action."). Accordingly, Defendants' supplemental motion for summary judgment will be granted on this claim.

## IV.

For the foregoing reasons, I will grant Defendants' supplemental motion for summary judgment [ECF No. 72]. An appropriate order will be entered this day.

**ENTERED** this 26th day of March, 2019.

SENIOR UNITED STATES DISTRICT JUDGE